IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| vs. | ) No. 06 C 7076 |
| NATIONAL TRAINING AND INFORMATION CENTER, INC., | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The government filed a complaint against defendant, National Information and Training Center ("NTIC"), alleging violations of the False Claims Act ("FCA") (31 U.S.C. § 3729(a)(1) and (2)). The government's claims stem from alleged false and fraudulent certifications and statements made by defendant to the Department of Justice ("DOJ"). The government seeks reimbursement of federal grant moneys for expenses related to illegally lobbying members of Congress and their employees. Defendant moves to dismiss the complaint as failing to state a claim upon which relief can be granted. For the following reasons we grant, in part, defendant's motion.

## BACKGROUND

The following facts are taken from the government's complaint and are presumed true for the purposes of this motion. Defendant NTIC is an organization created to assist communities in combating violence and crime. Between 1998 and 2003, the DOJ, through the Office of Justice Programs and pursuant to Title I of the Omnibus Crime Control and Safe Streets Act (42 U.S.C. § 3701 *et seq.*), awarded grants to NTIC totaling almost $4.5 million dollars. These grants were to be used to train and educate over 20 community organizations to assist in fighting violent crime, drugs and substance abuse in their respective

neighborhoods.

The distribution of grants under the Omnibus Crime Control and Safe Streets Act is governed, like all federal entitlement statutes, by the requirements of the Byrd Amendment (31 U.S.C. § 1352(a)). The Byrd Amendment requires, among other things, that no federal appropriated funds awarded to a grantee may be used "to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any [listed] Federal action." 31 U.S.C. § 1352(a)(1). The "federal actions" include the making and extension, continuation, renewal, amendment or modification of any federal grant or loan. § 1352(a)(2). The Act also requires disclosure by grantees if they engaged in lobbying using non-federal funds, and a certification on the part of the awardee that it has not and will not use federal money as prohibited by the Act. § 1352(b).

The Act requires the Office of Management and Budget ("OMB") to issue guidance for agency implementation of, and compliance with, the requirements of the statute. § 1352(b)(6). The regulations promulgated after the passing of the Byrd Amendment provide the language of the certification form. NTIC's initial and renewal applications contained signed copies of this certification. It agreed, in its application, to comply with the financial and administrative requirements set forth in the DOJ's Financial Guide, including the language of the Byrd Amendment. Based on these representations, the DOJ awarded an initial grant and three renewal grants to NTIC from 2000 to 2004.

After NTIC was awarded its first grant in 2000, it notified 24 sub-recipients that a mandatory conference would be held in Washington, D.C., from July 17-19, 2000. The purpose of the conference was to let the Bureau of Justice Affairs know what NTIC was doing with its grant money and to "lobby for 2001 funding" (cplt. ¶ 15). NTIC paid for all

conference expenses, including air and ground transportation, lodging, meals, and salaries of attending NTIC officers, from DOJ grant funds. In its letters to sub-recipients, NTIC included an invitation to a reception on July 14, 2000, and directed sub-recipients to forward this invitation to members of Congress. NTIC never disclosed to the DOJ that it was using federal funds for lobbying purposes. It hosted a Bureau of Justice Affairs reception to make it appear that the conference was for training purposes only, but then chartered buses to Capitol Hill to lobby Congress for funding.

The government alleges that NTIC conducted these same activities on three subsequent trips to Washington, D.C. on July 16-19, 2001, April 21-24, 2002, and September 23-24, 2002. It alleges that during each of these trips NTIC made it appear that it was engaging in training sessions with its sub-recipients, but was in fact lobbying, and encouraging its sub-recipients to lobby members of Congress and their employees. Each time, NTIC paid for all conference expenses, including NTIC salaries, out of federal grant moneys. The government alleges that NTIC intentionally failed to report its use of federal funds for lobbying purposes by falsifying documents, including meeting agendas, to make it appear as if no lobbying activities were being conducted during the conferences. It specifically alleges that NTIC's Executive Director sent an e-mail to its Project Director, asking in part whether NTIC needed to cover itself with Justice (referring to the DOJ) on its September 23, 2002, agenda, or "can we hokey up a title for a workshop – such as 'understanding how our government works or whatever'?" (cplt. ¶ 30).

The government alleges that through these actions defendant violated the False Claims Act in that it knowingly presented, or caused others to present, false or fraudulent claims to an officer, employee, or agent of the United States. § 3729(a)(1). Further, the government alleges that defendant knowingly made, used, or caused to be made, a false record or statement

to get a false or fraudulent claim paid or approved by the government in violation of § 3729(a)(2).

Defendant filed a motion to dismiss, arguing that the Byrd Amendment is unconstitutionally vague and overbroad, and is therefore facially unconstitutional under the First Amendment. Alternatively, defendant argues that this court should apply a narrow reading to the statute, one that would render defendant's conduct permissible. Finally, defendant argues that the government has failed to adequately plead fraud, as required by Rule 9(b) of the Federal Rules of Civil Procedure.

## ANALYSIS

On a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded allegations as true, and draw all reasonable inferences in favor of plaintiff. McMillan v. Collection Prof'ls, Inc., 455 F.3d 754, 758 (2006). Generally, under Rule 8(a), plaintiff need only set forth a short and plain statement of the allegations underlying plaintiff's claim. Plaintiff need not plead facts and may plead conclusions if such conclusions put defendant on notice of plaintiff's claims. McCormick v. City of Chicago, 230 F.3d 319, 324-25 (7th Cir. 2000). However, when plaintiff makes allegations of fraud, heightened pleading requirements are imposed. Fed. R. Civ. Pro 9(b). Under this rule "the circumstances must be stated with particularity," though intent or knowledge can be averred generally. This means that plaintiff must plead with specificity "the who, what, where, and when of the alleged fraud." Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins., 412 F.3d 745, 749 (7th Cir. 2005).

We first note that the government, in its response to the motion to dismiss, argues that defendant's attack on the Byrd Amendment is misplaced. It claims that the Byrd Amendment's constitutionality is not at issue here because it is suing under the FCA for defendant's alleged false certifications that it would comply with the DOJ's Financial

Management Guide, not its compliance with the Byrd Amendment. Further, it claims that while the Byrd Amendment "may be the reason why the DOJ implemented the required certifications and incorporated its Financial Management Guide into the terms of its Title I grants," it is, rather, NTIC's allegedly false certifications and agreements to comply with the Financial Guide as a whole that are the basis for this action. We cannot agree with the government's characterization of its claims. While the complaint states that "a recipient organization of a federal grant, including an earmark, must comply with all statutory, programmatic and financial requirements governing the grant program under which it is funded" (cplt. ¶ 8), the complaint alleges an FCA claim through defendant's false certification of compliance with § 1352, not its false agreement to comply with the Financial Guide as a whole. The complaint specifically states that NTIC's applications for federal assistance included "a conspicuous certification consistent with 31 U.S.C. § 1352(a)" (cplt. ¶¶ 11, 13). While the complaint further states that NTIC "agreed to comply" with the financial and administrative requirements" in the Financial Guide, it specifically points to provisions in that guide outlining the prohibitions and requirements of the Byrd Amendment (cplt. ¶ 11). Furthermore, the complaint centers around the false statements made in defendant's certification, but the only "certification" the government alleges that defendant made was the one relating to § 1352. The government cannot attempt to amend its complaint by its response to a motion to dismiss. Harrell v. United States, 13 F.3d 232, 236 (7th Cir. 1993). We find that the complaint, as written, specifically implicates the Byrd Amendment's certification requirement as the basis for its FCA claim, and thus the constitutionality of the Amendment is relevant to whether or not it has stated a claim upon which relief can be granted.

## Constitutionality of the Byrd Amendment

The Byrd Amendment of 1989 is a strange bird. In sum, it was designed to curb what

was seen as a fair amount of corruption in the awarding of federal grants, loans and contracts by prohibiting the use of federal funds to "pay any person for influencing or attempting to influence" decisions about those grants, loans or contracts. § 1352(a). It further created reporting and certification requirements for federal awardees and provided for civil penalties for violations of its provisions. § 1352(b)-(c). Though the statute has been criticized as being unclear and broad in scope, and overlapping of numerous other lobbying restrictions already in place, to date there has been no federal case law interpreting it. *See* Thomas M. Susman, *The Byrd Amendment, in* LOBBYING: A COMPLETE GUIDE TO FEDERAL LAW GOVERNING LAWYERS AND LOBBYISTS 265 (William V. Luneburg & Thomas M. Susman, eds., 3d ed., 2005). The only authority that both parties could tender to this court were two Comptroller General decisions and a handful of semi-analogous cases. Our task of interpretation is further hampered by the fact that the law was passed as an amendment to a much larger appropriations bill, providing scant legislative history, and no debate regarding its provisions. 135 Cong. Rec. S8779-80, S12,952 (1989)(statements of Sen. Byrd). Even more troublesome is the fact that the required implementation regulations promulgated by the OMB have never been finalized, and several clarifying regulations remain only proposals. OMB Interim Final Guidance, 54 Fed. Reg. 52306 (Dec. 20, 1989); OMB Notices regarding Interim Final Guidance, 55 Fed. Reg. 24, 540 (June 15, 1990); 57 Fed. Reg. 1772 (Jan. 15, 1992); 61 Fed. Reg. 1412 (Jan. 19, 1996). While the Byrd Amendment was amended by the passage of the Lobbying and Disclosure Act of 1995 ("LDA"), the changes made to the statute did not affect the general prohibitions of the Act. 61 Fed. Reg. 1412 (Jan. 19, 1996).[1]

---

[1] "The new lobbying statute essentially made three changes to the Byrd Amendment. The law: (a) simplified the information required by 31 U.S.C. 1352(b)(2)-(3) to be disclosed; (b) eliminated the requirement in 31 U.S.C. 1352(b)(6) that agencies submit semi-annual compilations to Congress; and, (c) eliminated the requirement in 31 U.S.C. 1352(d) for the Inspectors General's annual report to Congress." *Id.*

Defendant challenges the Byrd Amendment as being unconstitutionally vague and overbroad. It claims that it has standing to mount a facial challenge against this law because implicated is the right to free speech as guaranteed by the First Amendment, specifically the well-established right to petition the government. Defendant alleges that the fact that those entities whose activities are limited are recipients of federal funds "makes these rights not less but more important since the grantee is carrying out programs for important public purposes" (def. motion at 5).

Standing

Generally, a person seeking to challenge a statute has standing to do so only as the statute applies to his or her own conduct. Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973). However, where First Amendment rights are implicated, a person may raise a facial challenge to a statute, alleging that it is unconstitutional as applied to parties not before the court, even though the statute may be constitutional as applied to the conduct of the person before the court. Los Angeles Police Dep't. v. United Reporting Publ'g Corp., 528 U.S. 32, 38 (1999). In addition, in the context of the First Amendment, a person may challenge a law as being unconstitutionally vague even though his or her own conduct would clearly fall under the statute. NAACP v. Button, 371 U.S. 415, 432 (U.S. 1963). However, defendant is mistaken that the Byrd Amendment implicates the First Amendment.

There is no question that lobbying, generally, is protected by the First Amendment. *See e.g.* California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11, 92 S. Ct. 609, 611-12, 30 L. Ed. 2d 642 (1972); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 720, 11 L. Ed. 2d 686 (1964); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 137-38, 81 S. Ct. 523, 529-30, 5 L. Ed. 2d 464 (1961). If the statute in question was an attempt to regulate directly the lobbying activities of NTIC, it would be

analyzed with the strictest scrutiny. *See, e.g.*, Button, 371 U.S. at 438-39; Bates v. Little Rock, 361 U.S. 516, 524, 80 S. Ct. 412, 417, 4 L. Ed. 2d 480 (1960).

The Byrd Amendment, however, is a statute regulating the activity of those awarded an entitlement by the government in the form of a grant, loan, contract or other award of federal moneys; it is not a regulatory scheme applicable to the general public. The Supreme Court has recognized that such statutes "infringe no protected activity, for there is no right to have speech subsidized by the government." FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 256 n.9 (1986). By enacting statutes that prohibit the payment of lobbying expenses of federal awardees through federal funds, "Congress has not infringed any First Amendment rights or regulated any First Amendment activity." Regan v. Taxation with Representation, 461 U.S. 540, 546 (1983)(upholding statute prohibiting lobbying by organizations with § 501(c)(3) tax-exempt status); *see also* Cammarano v. United States, 358 U.S. 498 (1959)(upholding Treasury Regulation denying business expense deductions for lobbying activities). As no First Amendment rights are implicated, defendant does not have standing to mount a facial challenge to the statute, and the constitutionality of the statute must be analyzed in light of defendant's alleged conduct.

However, despite the Supreme Court's consistent mantra that there is no constitutional right to government-subsidized speech, the Court has on occasion entertained facial challenges to laws relating to public funding schemes. *See e.g.* National Endowment of the Arts v. Finley, 524 U.S. 569 (1998)(entertaining a facial challenge to a public funding scheme). Even in such situations, the Court has held that because there is no right to government subsidization of free speech, regulations relating to entitlement programs are entitled to greater leniency in their construction. Finley, 524 U.S. at 588 (upholding an "undeniably opaque" provision in the

context of selective subsidies).² This is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589. Thus, even if defendant did possess standing to mount a facial challenge against the Byrd Amendment, given the broad powers Congress possesses to legislate in this area, we hold that the statute is not unconstitutionally vague or overbroad. Since the Court has on several occasions permitted such challenges, we will address defendant's constitutional arguments despite our holding that it has no standing to pursue these claims.

Overbreadth

"The overbreadth doctrine is not casually employed. Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment," the Supreme Court has "recognized that the overbreadth doctrine is strong medicine and [has] employed it with hesitation, and then only as a last resort." United Publ'g, 528 U.S. at 39 (citations omitted).

A law is overbroad if it regulates substantially more speech that the Constitution permits to be regulated. New York v. Ferber, 458 U.S. 747, 769 (U.S. 1982). The Supreme Court "has, however, repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily

---

²Defendant, in several places in its motion, mistakenly argues that the Byrd Amendment is a criminal statute. We assume defendant is referring to 18 U.S.C. § 1913, which is the federal criminal statutory prohibition on lobbying with appropriated moneys. That statute only applies to federal officers and employees, and not to the private recipients of federal grants, contracts, or other federal disbursements. *See* Grassley v. Legal Services Corp., 535 F. Supp. 818, 826 (S.D. Iowa 1982). The Byrd Amendment is a civil statute, with civil penalties. Were the Byrd Amendment not a statute relating to entitlement, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498-499 (1982).

identifiable and constitutionally proscribable ... conduct .....'" Parker v. Levy, 417 U.S. 733, 760 (U.S. 1974)(quoting CSC v. Letter Carriers, 413 U.S. 548, 580-581 (1973)).

Defendant claims that the statute is overbroad because it does not use or define the term "lobbying," but seeks to bar all communication between recipients of federal funds and Congress. While it is true that the statute itself does not use the term "lobbying," the term can often be found in the comments of Senator Byrd.[3] Furthermore, the OMB Regulations are entitled "New Restrictions on Lobbying." 54 Fed.Reg. 52306. The fact that "lobbying" is not defined anywhere in the OMB regulations is of no consequence, as the regulations adequately set forth what types of communications are covered, as discussed below. Defendant's assertion that the statute bars all communication between recipients of federal funds and Congress is contrary to the text of the statute and the OMB regulations.

The text of the statute specifically limits the type of communication that falls within its ambit. Such communication must be "in connection with" a covered Federal action. The actions covered are the awarding of a Federal contract, the making of a Federal loan or grant, the entering into of any cooperative agreement or the extension, continuation, renewal, amendment, or modification of any of the above. Exempted by the statute is reasonable compensation paid to an officer or employee for certain specified communications that are of an agency or legislative liaison nature not directly related to a covered federal action. OMB Interim Final Rule §-.200, 55 FR 6736 (Feb. 26, 1990). Also exempted are "payments for professional or technical services rendered directly in the preparation, submission, or negotiation of any bid, proposal, or application" for a covered federal action. *Id.* at §-.205. The OMB has further supplemented its regulations to exclude the exchange of information between

---

[3] Senator Byrd specifically called his proposed amendment the "truth-in-lobbying amendment," and used the word "lobby" no less than ten times throughout his remarks. 135 Cong. Rec. S8779-80 (1989).

agencies and the public about available awards and the requirements for obtaining them, and communications relating to post-award activities. 55 FR 24540 (June 15, 1990).

Defendant alleges that the statute is so broad that it arguably covers the publication of booklets or annual reports, the creation and maintenance of a website or even the communications made to the press for purposes of publicity using federal funds. We disagree. The OMB definition of "influencing or attempting to influence" states:

> (h) *Influencing or attempting to influence* means making, with the intent to influence, any communication to or appearance before an officer or employee or any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any covered Federal action.

55 FR 6736.

To be covered by the statute, a communication or appearance must be made before one of the above-listed persons, thus removing from the scope of the statute the publication of booklets, annual reports, creation or maintenance of website, or communications to the press. Furthermore, a recipient of federal funds can tender any communication to an agency or Congress if it is in response to a specific request from Congress or that agency. § –.200(b). Finally, as noted above, the OMB issued a statement in response to a letter by Congressman Tim Penny that "routine and ongoing post-award activities to administer grants and contracts" do not fall within the definition of "influencing activities." 55 FR 24540 Therefore, while it is true that the act of sending of booklets or annual reports, even perhaps newspaper clippings, to one of the persons listed above may constitute a prohibited act, the mere publication of any of those things is not covered. Furthermore, sending such correspondence to an agency or a member of Congress can only be prohibited if it is done "with the intent to influence...in connection with any covered Federal action," and only if it (1) is not part of an ongoing post-award activity, (2) is not specifically requested by the agency or by Congress, or (3) does not

fall within one of the other exceptions listed in the OMB regulations.

Defendant argues that this statute is overbroad as it would prevent an anti-war group receiving federal funds from lobbying against the awarding of a large defense contract to, for example, Haliburton.[4] The fact that such activity may be covered by the statute, however, does not mean the statute is overbroad. The anti-war group is not prevented from lobbying against the defense contract, so long as it does so with non-appropriated funds and complies with the Act's registration requirements. Furthermore, it would not prevent the group from lobbying against defense contracts generally, so long as its lobbying campaign is not targeting a specific contract. *See* 55 FR 24540 (June 15, 1990); OMB's Proposed Changes, 57 FR 1772 (Jan. 15, 1992).[5]

Further, defendant takes issue directly with the OMB's regulations designed to assist in implementation of the Byrd Amendment. It particularly takes issue with the OMB requirement that awardees file a disclosure form "*if* such person has made or has agreed to make any payment using non-appropriated funds ... which would be prohibited" had it been

---

[4]The OMB regulations state that they do not govern procurement contracts as those contracts are covered by the FAR regulations. However, even under the FAR regulations, such lobbying costs could not be borne by the federal government. 48 C.F.R § 31.205-22 (2007).

[5]The OMB's regulations make a distinction between program lobbying and lobbying for a specific covered federal action. The former is permitted, while the latter is prohibited. 55 FR 24540 (June 15, 1990). However, because awardees were interpreting this exemption much more broadly, the OMB proposed a more restrictive interpretation of "program lobbying," and cited the following examples of what conduct is permitted and what is prohibited:

*Example 1:* A national membership association of public transit systems has several hundred members and engages in general advocacy for increased funding for public transit. With regard to a particular bill, the association lobbies Congressional Members and staff in support of an increase in the appropriation for public transportation systems. Because the influencing activity does not advocate earmarking awards for particular projects or awards to particular public transit systems which are members of the association, report of the influencing activity is not required.

*Example 2:* The same association in conducting its legislative lobbying program, advocates earmarking of funds for particular public transit systems' projects. This constitutes third party lobbying and is subject to the reporting requirements of the Act. 57 FR 1772.

Under the proposed changes, a grantee would not be prohibited from using its federal funds to lobby against defense contract funding generally. That proposed change has of yet not been finalized.

made with appropriated funds. § –.100(c). The word "if" in the above statement varies from the language in the statute prior to amendment by the LDA in 1995, which required awardees to file a disclosure form that contained a statement as to "*whether* such person has made or has agreed to make any payment...". Defendant argues that this "rule brings within the ambit of the law that much more expressive and associational conduct for which reporting is sought" (def. motion to dismiss, at 8). Whether or not the use of "if" instead of "whether" actually does include more expressive conduct is not an issue we need address because the statute as amended by the Lobbying Disclosure Act of 1995 removed any possible inconsistency by removing the offending language entirely. Now all that is required is the disclosure of any registrant who has made lobbying contacts on behalf of the awardee, and a certification that no prohibited payment has been or will be made. § 1352(b).[6] In total, we reject defendant's arguments and find that the statute is not unconstitutionally overbroad.

## Vagueness

Defendant asserts that the Byrd Amendment is invalid on its face because it is unconstitutionally vague. Though "unduly vague laws violate due process regardless of whether or not speech is regulated," courts are particularly wary of laws regulating speech out of concern that an unduly vague law may chill constitutionally permissible speech. Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 910-11 (2d ed. 2002)(citations omitted). A statute can be impermissibly vague if it either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or if it authorizes

---

[6] Defendant further claims that the statute is unconstitutional as the OMB regulations "unexplainedly differentiate between Congress and its staff and agency officials" by permitting certain communications to agencies that are prohibited when the communication is directed at Congress, its members or staff (def. motion, at 8-9). Defendant appears to assert this as evidence of the possibility of arbitrary application of the statute, rendering it vague. We do not agree that a distinction between what communications can be made to Congress and what can be made to an agency "licenses uncabined discretion by police or other public officers, thus inviting abuse," as defendant suggests (def. motion at 10).

or even encourages arbitrary and discriminatory enforcement. Hill v. Colorado, 530 U.S. 703, 732 (2000). We find that the statute here is not unconstitutionally vague under either standard.

Defendant claims that the phrase "influencing or attempting to influence" is unconstitutionally vague as it does not alert a reasonable person to what conduct is prohibited. Defendant fails to acknowledge that this phrase, as noted above, was defined by the OMB regulations. The OMB regulations define this phrase to mean "making, with the intent to influence, any communication to or appearance before" an agency, Congress, a member of Congress, or their employees or staff. The definition conspicuously includes the requirement that the communication be made with "intent to influence." The inclusion of the *mens rea* requirement of "intent" eliminates the possibility that a person or entity will be penalized for engaging in conduct without knowing that the conduct was prohibited. "The Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." Hoffman Estates, 455 U.S. at 499; *see also* Hill, 530 U.S. at 732 (scienter requirement that a person must "knowingly" approach, ameliorates vagueness concern).

We find that the *mens rea* requirement still satisfies vagueness concerns even though the prohibited conduct is once-removed from the actual communication. As interpreted by the OMB regulations, payments are prohibited when they are made to persons to engage in communications with the intent to influence. We believe that for the "intent" requirement to have force, it must necessarily extend beyond the person making the communication to the person making the payment as well. Therefore, we find that the statute, as interpreted by the OMB regulations, requires not only that the person making the communications has "intent," but that the person making the prohibited payment acts with "intent" to cause influence as well.

Defendant argues that the statute does not properly address what constitutes a

communication, rendering the enforcement of the statute within the overly broad discretion of the government. We agree that the term "communication," standing alone, appears vague. However, "the strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." Levy, 417 U.S. at 757 (quoting United States v. National Dairy Corp., 372 U.S. 29, 32-33 (1963)). By requiring the communication to be made with the "intent to influence," we find that concerns about possible discriminatory enforcement are ameliorated. Furthermore, as noted above, the OMB regulations lay out the types of communications which are exempt from the statute, making it substantially clear what communications are covered.

Defendant further argues that the phrase "in connection with" is also unconstitutionally vague. We disagree. The phrase "in connection with" is a phrase used frequently in statutes. While on at least one occasion a statutory provision using this phrase was subject to narrowing construction (Fed. Election Com. v. Mass. Citizens for Life, Inc., 479 U.S. 238 (U.S. 1986)), there the Court's concern was not so much with the phrase "in connection with," but with the lack of definition of the term "expenditure" preceding that phrase. Here the phrase "in connection with" is buttressed by terms fully defined by either the statute or the subsequent OMB regulations, including a term providing for a *mens rea* requirement. We therefore find that this phrase as a whole is not unconstitutionally vague. Furthermore, any opaqueness that may arise through this term can be clarified on a case-by-case basis. We hold that the statute is not unduly vague.

## Applicability to Defendant's Conduct

We turn, then, to the conduct specifically alleged here. It relates to two kinds of payments. One is payment directly to vendors, such as airlines. The government does not

allege that any of the sub-recipients made the payments and then were reimbursed. The other is payment to NTIC officials for their lobbying efforts, not for agency and liaison activities not directly related to a covered action.

Defendant argues that the statute, as written, does not reach defendant's alleged conduct. The statute states that what is prohibited are payments made to "*any person* for influencing or attempting to influence" a decision of Congress or a federal agency. Defendant argues that this language means general expenditures that may influence such a decision are not covered by the statute, only the paying of a person for the purpose of influencing that decision. In support, defendant cites In re Construction Aeronauticas, S.A., 71 Comp. Gen. 81; 1991 U.S. Comp. Gen. LEXIS 1315 (1991). There, the Comptroller General held that expenses such as telephone calls and airline tickets incurred in connection with employee lobbying activities did not fall within the purview of the Byrd Amendment. The Comptroller stated: "Such payments are not made to the airlines or telephone companies to cause those companies to influence agency or congressional officials, which is what is encompassed by the Byrd Amendment; the payments represent only the value of the transportation and communications services rendered." *Id.* at *10.

The government does not directly address this argument. Instead, it asserts that this decision was rendered prior to the passing of the Lobbying Disclosure Act which amended the Byrd Amendment, and therefore these cases are not helpful. However, as noted above, the LDA's amendments did not affect the general scope of the Byrd Amendment, which is what is at issue here. The government argues that the LDA "reflects Congress' intent to have the present statute rigorously enforced" by its language that "[t]he head of each Federal agency shall take such actions as are necessary to ensure that the provisions of this section are vigorously implemented and enforced in such agency." But this language was not added to the

Byrd Amendment by the LDA. This same language appeared in the original version of the Byrd Amendment, the one considered by the Comptroller General. *See* Pub. L. 101-121, § 319(g)(codified as 31 U.S.C. § 1352(g)(1990).

The government argues that the DOJ's Financial Management Guide is, in part, its "necessary action to ensure" that the Byrd Amendment is complied with, and the Guide prohibits the expenditure of any federal moneys for lobbying purposes, whether or not those moneys are paid to a person or to third parties for services in connection with lobbying activity. The provisions the government cites, however, were not, as it implies, the brainchild of the DOJ in response to the LDA's request for vigorous implementation. These provisions mostly mimic the OMB's directives on cost principles for non-profit organizations, which, in pertinent part, outline certain activities whose costs are not allowable as charges to Federal awards. Cost Principles for Non-Profit Organizations, 2 C.F.R. § 230 *et seq.* (2007)(specifically Appendix A). The directive on Cost Principles was implemented prior to the passage of the Byrd Amendment as OMB Circular A-122, and has survived its enactment. The fact that some prohibited acts under the statute may also fall under the OMB's unallowable costs does not mean that the Cost Principles affect the interpretation of the Byrd Amendment any more than the Byrd Amendment could affect what costs are unallowable under the Cost Principles. We reject the government's attempt to conflate the prohibitions of the Byrd Amendment with the unallowable costs of the OMB's Cost Principles, which are not the basis for the present action as currently alleged in the complaint.

Defendant's argument that the statute does not cover moneys paid to third parties not involved in the lobbying, such as airlines and telephone companies, is supported by the text of the statute itself. It specifically requires that payments be made to a "person for influencing or attempting to influence...." The OMB regulations further state that a communication must

be made by the party who has been paid, and made either to or in front of Congress or an agency, and that the communication must be made with the intent to influence.

The Comptroller is correct that, based on this language, payments to hotels, airlines, restaurants and other service providers do not appear to be prohibited as envisioned by the statute. Furthermore, the legislative history makes no mention of such payments. The bulk of the comments on the Byrd Amendment related to the payments made to "Washington insiders," or professional lobbyists who hold themselves out to have all the right connections and can obtain money for their clients based on those connections, rather than the merit of the program presented. 135 Cong. Rec. 8779-80 (1989). Additionally, the fact that these costs are considered unallowable under other OMB regulations in place prior to the enactment of the Byrd Amendment, lends further support to the argument that the statute was not intended to reach such activity. 2 C.F.R. § 230 Appendix A (2007). We do not see how payments to service providers on behalf of employees or association members lobbying Congress constitutes prohibited payments under the specific language of the Act. It would be a different matter if the payments were reimbursements to the sub-recipient doing the lobbying, but that is not what is alleged here.

While we agree with defendant that certain of the alleged payments (food, lodging, airfare, etc.) do not fall under the Byrd Amendment, such is not the case with the other alleged kind of payment: the salaries of the attending NTIC officers. The Byrd Amendment makes one specific exception to its prohibition on use of appropriated funds in relation to officers and employees: "reasonable compensation ... to the extent that the payment is for agency and legislative liaison activities not directly related to a [covered] Federal action." § 1352(d)(1)(A).[7]

---

[7] The Act also excepts from its reporting requirements reasonable payments (of non-appropriated funds) to employees, irrespective of the employee's lobbying activity. § 1352(d)(2)(A). Defendant's motion appears to conflate these two exceptions, but the distinction is important for the purposes of this action.

That exception does not extend to compensation spent engaging in lobbying activities. Therefore, to the extent that any of the money reimbursed was allegedly expended to pay salaries of NTIC officers for time spent engaging in lobbying activities, the government's claims fall within the ambit of the Act. Defendant's motion to dismiss is granted as to alleged conduct that does not fall within the purview of the statute.

Fraud

Defendant argues that the government has failed to allege fraud with the level of specificity required by Rule 9(b). Rule 9(b) requires that allegations of fraud be pled with particularity. This requires the government to plead the who, what, when, and where of the alleged fraud. Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins., 412 F.3d 745, 749 (7th Cir. 2005). However, the particularity requirement of Rule 9(b) must be read together with the liberal notice pleading standard of Rule 8. Tomera v. Galt, 511 F.2d 504 (7th Cir. 1975). In addition, Rule 9(b) permits that "malice, intent, knowledge, and other condition of mind of a person, may be averred generally." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (U.S. 2007). Thus, Rule 9(b) does not require that the complaint explain the government's theory of the case, but that it alleges the date and content of the misrepresentation that it claims was fraudulent. Midwest Commerce Banking Co. v. Elkhart City Ctr., 4 F.3d 521 (7th Cir. 1993).

Here, the government has sufficiently plead the who, what, when, and where of the fraud. It has made specific allegations against NTIC and its executives, Jaci Feldman, Joseph Mariano, and Shel Trapp (cplt. ¶ 15)[8]. It has alleged specifically what information defendant included with its applications for federal funding and when it filed those applications (cplt. ¶

---

[8] There appears to be two paragraphs numbered 15 in the complaint. For ease of reference, we ignore the mistake and cite to paragraph 15 without modification.

9-13). It specifically alleges the dates of many of the conferences that NTIC allegedly held, going even so far as to delineate specific times of certain sessions, or times that participants were allegedly transported to lobby Congress (cplt. ¶ 15-30). The complaint further offers specific alleged statements of defendant's executives and officers, which if proven true, would be evidence of fraud. (*See e.g.* cplt. ¶ 15 ("because this is a hard earmark - lobby for 2001 funding")). Therefore, the government has sufficiently alleged fraud under Rule 9(b).

## CONCLUSION

For the foregoing reasons, we grant defendant's motion to dismiss as to the payments not covered by the Byrd Amendment, and deny the motion with regard to the payments that are covered. We grant the government leave to amend its complaint.

_____
JAMES B. MORAN
Senior Judge, U. S. District Court

Aug. 23, 2007.
8-23-07